# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

_____

| | |
|---|---|
| SLOAN STEWART, <br> 2343 Roper Mountain Road <br> Simpsonville, South Carolina 29681 <br><br>     individually and on <br>     behalf of all others similarly situated, <br><br>      Plaintiff, <br><br>     v. <br><br> KNORR-BREMSE AG <br> Moosacher Str. 80 <br> Munchen, 80809 <br> Germany <br><br> KNORR BRAKE COMPANY LLC <br> 1 Arthur Peck Drive <br> Westminster, Carroll County, Maryland 21157 <br><br> NEW YORK AIR BRAKE LLC <br> 748 Starbucks Avenue <br> Watertown, New York 13601 <br><br> WESTINGHOUSE AIR BRAKE <br> TECHNOLOGIES CORPORATION <br> 1001 Air Brake Avenue <br> Wilmerding, Pennsylvania 15148 <br><br> WABTEC PASSENGER TRANSIT <br> P.O. Box 11 <br> Spartanburg, South Carolina 29304 <br><br> FAIVELEY TRANSPORT, S.A. <br> 3, rue du 19 mars 1962 <br> 92230 Gennevilliers <br> France <br><br> FAIVELEY TRANSPORT <br> NORTH AMERICA, INC. <br> 50 Beechtree Boulevard <br> Greenville, South Carolina 29605 | **Case No.** <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

DOES 1-50, Inclusive                                      )
Identities and addresses currently unknown               )
                                                          )
DOES 51-100, Inclusive                                    )
Identities and addresses currently unknown               )
                                                          )
              Defendants.                                 )
_____)

Plaintiff Sloan Stewart brings this action under the antitrust laws of the United States on behalf of himself and a class of all others similarly situated (the "Class," defined below), against Defendants Knorr-Bremse AG, Knorr Brake Company LLC, New York Air Brake LLC (collectively, "Knorr"), Westinghouse Air Brake Technologies Corporation ("Wabtec"), Wabtec Passenger Transit, a business unit of Wabtec, Faiveley Transport, S.A., a subsidiary of Wabtec, and Faiveley Transport North America, Inc., a subsidiary of Wabtec, based on Defendants' and unnamed co-conspirators' unlawful conspiracy to suppress Plaintiff's and Class members' compensation. Plaintiff brings this action to recover damages for the lost compensation, including treble damages and other appropriate relief, and further alleges as follows:

## SUMMARY OF THE ACTION

1.      From 2009 to the present, Defendants—some of the world's largest rail equipment suppliers, and subsidiaries or business units thereof—along with other unnamed individuals and entities acting as co-conspirators, conspired not to recruit, solicit, or hire without prior approval each other's personnel (the "No-Poach Conspiracy" or "Conspiracy"). The No-Poach Conspiracy, which is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, limited Plaintiff's and Class members' job mobility and, in turn, suppressed their compensation below the levels that would have been available absent the Conspiracy.

2.      On April 3, 2018, Defendants Knorr and Wabtec announced their agreement to settle charges brought by the Department of Justice ("DOJ"), after the DOJ's lengthy investigation of the No-Poach Conspiracy. The DOJ found that Defendants' agreements that formed the No-

Poach Conspiracy were *per se* violations of the Sherman Act. The DOJ stated these agreements "were facially anticompetitive because they eliminated a significant form of competition to attract skilled labor in the U.S. rail industry." Specifically, the DOJ said further that "these agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."

3.      Although the DOJ and Defendants have reached a settlement, pursuant to which Defendants have agreed to certain ongoing conduct remedies, the DOJ settlement does not provide relief for those who were injured by the No-Poach Conspiracy. Without this class action, Plaintiff and the Class will not receive compensation for their injuries, and Defendants will continue to retain the benefits of their unlawful collusion.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

6.      Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more Defendants resides in, can be found in, and/or transacts business in this District.

7.      Defendants are subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of Maryland. In

particular, each Defendant, among other things: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District. Additionally, both Knorr and Wabtec have facilities in, and personnel working in, the state of Maryland.

## THE PARTIES

8.     Plaintiff Sloan Stewart was an employee of Faiveley Transport North America, which has since been acquired by Wabtec. Mr. Stewart was employed by Faiveley from July 2008 until June 2013. Mr. Stewart held multiple positions at Faiveley, including, most recently, National Sales Manager. Mr. Stewart is a resident of Simpsonville, South Carolina.

9.     Defendant Knorr-Bremse AG is a privately owned German company with headquarters in Munich, Germany. Knorr-Bremse AG is a leading manufacturer of rail and commercial vehicle equipment, and holds several wholly owned subsidiaries in the United States.

10.     Defendant Knorr Brake Company LLC is a Delaware corporation with headquarters in Westminster, Maryland, and is a wholly owned subsidiary of Defendant Knorr-Bremse AG. Knorr Brake Company manufactures systems such as train control, braking, and door equipment used on passenger rail vehicles.

11.     Defendant New York Air Brake LLC is a Delaware corporation with headquarters in Watertown, New York, and is a wholly owned subsidiary of Defendant Knorr-Bremse AG. It manufactures railway air brakes and other rail equipment used on freight trains.

12.     Defendant Westinghouse Air Brake Technologies Corporation is a Delaware corporation with headquarters in Wilmerding, Pennsylvania, and is a leading provider of freight and passenger rail equipment and services. Defendant Wabtec Passenger Transit is a business unit

of Westinghouse Air Brake Technologies Corporation, and is based in Spartanburg, South Carolina. Wabtec Railway Electronics is also a business unit of Westinghouse Air Brake Technologies Corporation, and is based in Germantown, Maryland.

13.     On or about November 30, 2016, Wabtec acquired Defendant Faiveley Transport S.A. ("Faiveley"), which was a French société anonyme based in Gennevilliers, France. Before the acquisition, Faiveley was also a leading rail equipment manufacturer and supplier. Faiveley is now a wholly owned subsidiary of Wabtec. In the United States, Faiveley conducted business through its wholly-owned subsidiary Defendant Faiveley Transport North America, Inc., a New York corporation with headquarters in Greenville, South Carolina.

14.     Plaintiff alleges on information and belief that DOES 1-50, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof. DOES 1-50 are corporations, companies, partnerships, or other business entities.  Plaintiff is presently unaware of the true names and identities of those entities sued herein as DOES 1-50, and will amend this Complaint to allege the true names of the DOE defendants when he is able to ascertain them.

15.     Plaintiff alleges on information and belief that DOES 51-100, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof. DOES 51-100 are corporate officers, members of the boards of directors, or senior executives of Defendants.  Plaintiff is presently unaware of the true names and identities of those Defendants sued herein as DOES 1-50, and will amend this Complaint to allege the true names of the DOE defendants when he is able to ascertain them.

## FACTUAL ALLEGATIONS

**A.    Trade and Commerce**

16.    Throughout the Class Period (defined below), Defendants employed Class members throughout the United States, including in this District.

17.    Defendants' conduct substantially affected interstate commerce, and caused antitrust injury, throughout the United States.

**B.    Market for Rail Equipment**

18.    The rail equipment industry is worth billions of dollars, both globally and within the United States alone.

19.    As alleged in the DOJ complaint, Knorr and Wabtec are the world's leading rail equipment suppliers and are rivals in the development, manufacture, and sale of freight and passenger rail equipment. Before its acquisition by Wabtec, Faiveley was the world's third-largest rail equipment supplier and also competed for business with Knorr and Wabtec.

20.    Both Knorr and Wabtec—including their many subsidiaries—create and sell a wide range of systems and products for the broader freight and passenger rail industries. Knorr, for example, manufactures braking systems, door systems, air conditioning systems, derailment detectors, and train control components, among other things. Similarly, Wabtec manufactures central diagnostic systems, braking systems, door systems, and temperature control systems, in addition to other products.  Wabtec also builds new locomotives.

21.    Knorr's Rail Vehicle Systems division has more than 16,000 employees and posted more than $4 billion in global sales in 2017.

22.    Wabtec employs more than 18,000 people and had sales of $3.88 billion in 2017.

23.    Both Knorr and Wabtec have dozens of subsidiaries, some of which are based in the United States.

C.      **Market for Rail Equipment Labor**

24.      In addition to competing for business, Knorr and Wabtec – and their many subsidiaries – also ostensibly compete with each other to attract, hire, and retain skilled labor with rail industry experience, who are in high demand and limited supply. Personnel of other entities within the rail industry are thus key sources of potential talent to fill open positions at companies such as Knorr and Wabtec.

25.      As the DOJ found in its investigation of Defendants, companies in the rail industry not only receive direct applications from individuals who are interested in potential employment opportunities, but also directly solicit skilled labor from other entities in the rail industry. This type of recruiting often involves "cold calling," or communicating directly with an individual who has not otherwise applied for a position. Cold calling is especially useful because the skilled labor of other companies within the rail industry have the requisite specialized skills and may be unresponsive to other methods of recruiting.

26.      Cold calling and other poaching methods also significantly impact compensation in a number of ways.

27.      First, direct solicitation provides personnel with valuable information about the labor market that they would not otherwise have, and thus also gives them leverage in negotiations. When an individual receives a cold call from a rival company with an offer that exceeds his current compensation, he can accept that offer and change employers, or he can use the offer to negotiate increased compensation from his current employer. Either way, he can use the competition between the companies to increase his own compensation.

28.      Second, through cold calling a company also gathers information about the rival's compensation practices. This increase in information and transparency regarding compensation

has the effect of increasing compensation, in turn, because employers are pressured to match or exceed a rival's compensation package in order to recruit and retain quality skilled labor.

29.    Third, when a company anticipates that its personnel will be cold called by its rivals and thus tempted to change employers, the company will preemptively increase compensation in order to reduce the risk of poaching.

30.    These effects are not limited to individuals who have received cold calls or applied for jobs at rival companies, but instead extend to all personnel. For example, an individual who has received a cold call and gained information about a rival's compensation can share that information with his colleagues, who can also use it to negotiate pay increases or obtain offers from the rival company, even though they did not receive cold calls themselves.

31.    Additionally, companies monitor and manage their internal compensation structures to achieve certain goals, such as maintaining approximate compensation parity among personnel within the same job categories and certain compensation relationships across different job categories and levels of seniority. To accomplish these and other objectives, including recruiting and retaining skilled labor, companies set baseline compensation levels for their various job categories. These baseline levels are affected by the factors discussed above – so, for example, a company may be forced to increase a particular baseline compensation level if the affected individuals are being poached by rivals with better offers. The reverse is also true: if its personnel are not being poached, a company can keep its baseline compensation at lower levels.

32.    When a company negotiates compensation with an individual, the negotiation is, at the very least, profoundly influenced by the baseline compensation level. Accordingly, the suppression of baseline compensation results in the suppression of total compensation.

33.    In short, in a competitive labor market, rail industry employers compete with each other to attract highly skilled individuals. This competition benefits labor because it increases

awareness of available job opportunities and improves an individual's ability to negotiate for a better salary and other terms of employment. These benefits extend to all, including those who do not intend to move between companies, because, among other things, employers have incentives to offer competitive baseline pay levels and maintain internal equity in their compensation structures.

34.     As alleged in the DOJ complaint, the no-poach agreements at issue disrupted these normal competitive mechanisms within the labor market for rail industry personnel, harming competition and thus the Class members.

        **D.      DOJ Investigation**

35.     Beginning in or around 2016, the Antitrust Division of the United States Department of Justice started an investigation into the employment practices of Defendants. As a result of its investigation, the DOJ concluded that Defendants had agreed to unreasonable restraints of trade that were *per se* unlawful under the antitrust laws. Specifically, the DOJ said, the no-poach agreements "were facially anticompetitive because they eliminated a significant form of competition to attract skilled labor in the U.S. rail industry." The DOJ also stated that "these agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."

36.     On April 3, 2018, the DOJ filed a complaint alleging that Defendants' No-Poach Conspiracy violated Section 1 of the Sherman Act. The DOJ also filed a stipulated proposed final judgment in which Wabtec and Knorr agreed that the DOJ's complaint "state[d] a claim upon which relief may be granted against the Defendants under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1."

37.    In the stipulated proposed final judgment, Wabtec and Knorr are "enjoined from attempting to enter into, entering into, maintaining, or enforcing any No-Poach Agreement or No-Poach Provision." Wabtec and Knorr also agreed to comply with a variety of enforcement measures.

38.    The DOJ has not sought monetary penalties of any kind against Defendants, and has made no effort to compensate individuals who were harmed by the Conspiracy. Thus, without this class action, Plaintiff and the Class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

**E.    The Conspiracy to Fix the Compensation of Their Personnel at Artificially Low Levels**

39.    As alleged in the DOJ complaint, beginning in January 2009, at the latest, Defendants entered into the No-Poach Conspiracy in order to eliminate competition between them for skilled labor. This overarching Conspiracy consisted of interconnected agreements that were developed and enforced by senior executives and reached some of the companies' United States subsidiaries and business units, including Knorr Brake Company LLC, New York Air Brake LLC, Wabtec Passenger Transit, Faiveley Transport North America, Inc., and other co-conspirators.

40.    These agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration.

41.    Defendants entered into the express agreements, and into the overarching conspiracy, with knowledge of the other Defendants' participation and with the intent of accomplishing the Conspiracy's objective: to reduce compensation paid to individuals for their services, including to employees and contractors, by eliminating competition for skilled labor.

a.    **Wabtec-Knorr Agreement**

42.    Beginning no later than 2009, Wabtec and Knorr Brake Company's senior executives entered into an express no-poach agreement, about which they directly communicated. For example, in a letter dated January 28, 2009, a director of Knorr Brake Company wrote to a Wabtec senior executive: "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent cause for both companies. As you so accurately put it, 'we compete in the market.'"

43.    While Knorr Brake Company is a Knorr-Bremse AG subsidiary, Knorr-Bremse AG senior executives were aware of the agreement. Top Knorr executives in Germany were also included in key communications about this no-poach agreement.

44.    In furtherance of their agreement, Wabtec and Knorr Brake Company each instructed their outside recruiters not to solicit personnel from the other company.

45.    In at least some instances, Wabtec and Knorr Brake Company's no-poach agreement prevented them from considering unsolicited applications from the other firm's personnel, unless the other firm gave approval. For example, in 2010, a Knorr Brake Company senior executive stated that, without the permission of his Wabtec counterpart, he would not consider the application of Wabtec personnel who had applied to Knorr Brake Company.

46.    This agreement also reached other Wabtec and Knorr subsidiaries. For example, in July 2012, a New York Air Brake senior executive stated that he could not consider the application of Wabtec personnel due to Wabtec and Knorr's no-poach agreement.

47.    Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with each other to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had

solicited an individual at Knorr Brake Company for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr personnel going forward due to the existing no-poach agreement between the companies.

    **b.    Knorr-Faiveley Agreement**

    48.    Beginning no later than 2011, senior executives at Knorr Brake Company and Faiveley Transport North America entered into an express no-poach agreement that included commitments to contact each other before pursuing personnel of the other company. For example, in October 2011, a Knorr Brake Company senior executive stated in an email to an executive at Knorr-Bremse AG that a conversation with a Faiveley Transport North America executive had "resulted in an agreement between us that we do not poach each other's employees.  We agreed to talk if there was one trying to get a job[.]"

    49.    In or about 2012, executives from Knorr Brake Company and Faiveley Transport North America discussed the no-poach agreement at a trade show in Germany. Thereafter, the executives enforced the agreement through direct communications with each other and other senior executives at the two companies. For example, in October 2012, Faiveley Transport North America executives stated in an internal communication that they were required to contact Knorr Brake Company before hiring a train brake engineer in the United States.

    50.    When Wabtec announced its proposed acquisition of Faiveley, a high-level Knorr executive directed the company's recruiters to raid Faiveley for potential personnel, temporarily "cheating" on the no-poach agreement.

      **c.**      **Wabtec-Faiveley Agreement**

51.      Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley Transport North America entered into a no-poach agreement, which included commitments to notify and obtain approval from each other before hiring each other's personnel.

52.      Executives from these two companies enforced their no-poach agreement through direct communication. For example, in January 2014, a Wabtec Passenger Transit executive explained to his colleagues that he could not engage in hiring discussions with Faiveley Transport North America personnel without first getting permission, stating that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]."

53.      Similarly, another Wabtec Passenger Transit executive informed his staff that hiring Faiveley Transport North America's personnel was "off the table" due to the no-poach agreement.

54.      Wabtec announced its intent to acquire Faiveley in July 2015. Faiveley is now a wholly owned subsidiary of Wabtec.

## CLASS ACTION ALLEGATIONS

55.      Plaintiff brings this action on behalf of himself and all others similarly situated ("the Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons who were paid for personal services by any of the Defendants, or by any wholly owned subsidiary of any Defendant, including Defendants' employees or contractors, at any time from January 1, 2009, to the present. Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants and their wholly owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

56.     Plaintiff does not yet know the exact size of the Class because such information is in the exclusive control of Defendants and the co-conspirators, but based upon the nature of trade and commerce involved, as well as the scope and duration of the conspiracy, Plaintiff believes that there are at least hundreds, if not thousands, of Class members, and that Class members are geographically dispersed throughout the United States. Therefore, joinder of all members of the Class is not practicable.

57.     The questions of law or fact common to the Class include, but are not limited to:

    a.     whether the Conspiracy violated the Sherman Act;

    b.     whether the Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

    c.     whether Defendants and unnamed co-conspirators collectively or individually possessed market power in the relevant market;

    d.     whether the Conspiracy and associated agreements restrained trade, commerce, or competition for labor;

    e.     whether Plaintiff and the Class suffered antitrust injury or were threatened with injury; and

    f.     the type and measure of damages suffered by Plaintiff and the Class.

58.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

59.     Plaintiff's claims are typical of the claims of the Class.

60.     Plaintiff will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

61.     Plaintiff has retained competent counsel experienced in antitrust litigation and class action litigation to represent himself and the Class.

62.    Defendants and the unnamed co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

63.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.  By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## ANTICOMPETITIVE EFFECTS

64.    The No-Poach Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented, and policed these agreements with the knowledge of the overall conspiracy, and did so with the intent and effect of fixing the compensation paid to their personnel at artificially low levels.

65.    Plaintiff and each member of the Class were harmed by every agreement alleged herein. The elimination of competition and suppression of compensation due to the Conspiracy affected all Class members. For example, Wabtec personnel received lower compensation as a result of not only Wabtec's illicit agreements with Knorr Brake Company, but also as a result of Knorr's agreement with Faiveley, and so on.

66.    The harm not only reached individuals who did, or otherwise would have, changed companies, but also extended to those who had no intention of leaving their companies, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

67.    While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for rail equipment manufacturers and suppliers in the United States.

68.    Wabtec and Knorr, along with their many subsidiaries, are the two largest competitors in this market—and, before its acquisition by Wabtec, Faiveley was the third-largest— and they possess significant market power. Acting in concert, Defendants and unnamed co-conspirators have the power to suppress compensation and eliminate competition in the relevant market.

69.    Through the No-Poach Conspiracy, Defendants exercised and maintained this power, and did in fact suppress compensation and eliminate competition.

### FRAUDULENT CONCEALMENT OF THE CONSPIRACY

70.    While Plaintiff had knowledge of aspects of Defendants' and industry hiring practices, Plaintiff had neither actual nor constructive knowledge of Defendants' unlawful conspiracy until the DOJ's settlement with Defendants became public on April 3, 2018. At no point did Defendants inform Plaintiff that his compensation was not competitive but was instead suppressed by Defendants' anticompetitive agreements. Plaintiff therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

71.    Defendants publicly described themselves as competitors. Wabtec's 2017 Form 10-K listed Knorr as a principal competitor." Knorr's 2017 Annual Report described the rail vehicle market as "highly competitive." And in the related commercial vehicle market, Knorr identified WABCO (a trade name of Wabtec) as "its principal competitor." These statements indicated to the public that Defendants were competing, not acting as co-conspirators and agreeing not to compete in the market for rail equipment employees.

16

72.     Wabtec's 2017 10-K also stated that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including conducting its business activities within the laws of host countries in which the Company operates." Knorr's Code of Conduct similarly states that the company "expect[ed] the entire workforce not only to observe internal regulations but also to observe the law." These statements indicated that Defendants were acting lawfully, not engaging in a long-running anticompetitive conspiracy to suppress the compensation of their employees.

73.     Conspiracies, by their nature, must be concealed. To keep the conspiracy hidden, Defendants' discussions in furtherance of the conspiracy often occurred through direct, private conversations between senior executives or through email exchanges between senior executives or recruiters. Defendants relied on non-public forms of communication (e.g., private email) to effectuate their conspiracy and to avoid disclosure of the full scope of the conspiracy beyond the individuals involved.

74.     Before the DOJ's announcement, none of the relevant communications between Defendants were public or could have been known to Plaintiff. While the DOJ has been investigating non-solicitation agreements since at least 2010—and has taken action against companies like Adobe, Apple, Ebay, Google, and Intel—the DOJ apparently only became aware of Defendants' conspiracy during its merger review of Wabtec's 2016 acquisition of Faiveley. Plaintiff was not a part of the merger review and did not have access to the documents provided to the DOJ as part of that review.

75.     As a result of Defendants' successful efforts to conceal the fact of, and scope of, the No-Poach Conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiff's claims concerning Defendants' conspiracy.

## CLAIM FOR RELIEF
### (Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1)

76.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint, and further alleges the following:

77.     Beginning no later than January 2009 and continuing until the present, Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

78.     Defendants' agreements have included concerted actions and undertakings among themselves with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

79.     As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

80.     The unlawful agreements among Defendants have had the following effects, among others:

      a.     competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and

      b.     Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

81.     The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective

officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

82.     Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

83.     Accordingly, Plaintiff and Class members seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## DEMAND FOR JURY TRIAL

84.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

85.     WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf and that of the Class by adjudging and decreeing that:

a.      This action may be maintained as a class action, with Plaintiff as the designated Class representative and his counsel as Class counsel;

b.      Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act, and that Plaintiff and the Class members have been damaged and injured in their business and property as a result of this violation;

c.      The alleged combinations and conspiracy are *per se* violations of the Sherman Act;

d.      Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, as alleged herein;

19

e.      Judgment be entered for Plaintiff and Class members, and against Defendants, for three times the amount of damages sustained by Plaintiff and the Class, as allowed by law;

f.      Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.      Plaintiff and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

h.      Plaintiff and the Class are entitled to such other and further relief as is just and proper under the circumstances.

Dated: May 1, 2018

/s/ *Paul Mark Sandler*
Paul Mark Sandler (Bar No. 00145)
Eric R. Harlan (Bar No. 23492)
SHAPIRO SHER GUINOT & SANDLER
250 West Pratt Street
Suite 2000
Baltimore, MD 21201
Tel: (410) 385-0202
Fax: (410) 539-7611
pms@shapirosher.com
erh@shapirosher.com

Eric L. Cramer (*pro hac vice forthcoming*)
Michael Dell'Angelo (*pro hac vice forthcoming*)
Karissa Sauder (*pro hac vice forthcoming*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
ksauder@bm.net

Daniel Walker (*pro hac vice forthcoming*)
BERGER & MONTAGUE, P.C.
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Tel: (202) 559-9745
Fax: (215) 875-4604
dwalker@bm.net

Joseph R. Saveri (*pro hac vice forthcoming*)
Steve N. Williams (*pro hac vice forthcoming*)
Jiamie Chen (*pro hac vice forthcoming*)
Kyla J. Gibboney (*pro hac vice forthcoming*)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street
Suite 1000
San Francisco, CA 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
jchen@saverilawfirm.com
kgibboney@saverilawfirm.com

*Attorneys for Plaintiff Sloan Stewart and the*
*Proposed Class*